UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JODY LEE BEACH and
RHONDA B. BEACH,  Case no. 21-10762-t13

    Debtors.

IRON HORSE WELDING, LLC,

    Plaintiff,

v.  Adv. no. 21-1028-t

JODY LEE BEACH and
RHONDA B. BEACH,

    Defendants.

## **OPINION**

    The Court tried the merits of this embezzlement nondischargeability proceeding, involving $16,859.98 charged to Plaintiff Iron Horse's credit card. Iron Horse asserts that the charges, which paid Defendants' phone bills, were unauthorized. Defendants counter that they *were* authorized, but that Iron Horse has changed its story now that the parties are no longer friends. The Court rules that Iron Horse did not carry its burden of proving that the charges were unauthorized, so the embezzlement claims fails.

A.  Facts.[1]

The Court finds:[2]

Iron Horse is a New Mexico limited liability company. Its sole owner and manager is Charles Allan Grisham. Grisham started Iron Horse in 1999 with little other than a welder. He did not attend college and is a self-made man. Through hard work and perseverance, Grisham built Iron Horse into a successful weld fabrication and heavy equipment repair business.

Grisham knew Jody Beach through contacts in the welding industry. Jody[3] had a lot of experience with field service repair work and had a number of customers and contacts. Grisham wanted Iron Horse to expand its business into field service repairs, so he hired Jody in April 2010. Jody's starting salary was $10,000 a month.

Jody brought a lot of field service business to Iron Horse. To handle the new work, Iron Horse bought three F-750 and one F-550 trucks. Fully equipped, each truck cost about $130,000. Iron Horse also built a $300,000 shop at the back of its yard to accommodate additional work. Although the Court does not have the evidence needed to quantify the increase in Iron Horse's business after Jody was hired, it was significant.[4]

Iron Horse hired Rhonda Beach in October 2011 because the office manager, Ashley Chase, told Grisham that the field service operations were not making money. Grisham asked

---

[1] The Court takes judicial notice of its docket and the dockets of Iron Horse's and/or Allen Grisham's state court actions against Beach, Tammy Swagert, Ashley Chase, Jason Platero. In addition, the Court takes judicial notice of the docket in Tammy Swagert's 2007 bankruptcy case and related adversary proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).
[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.
[3] The Beaches will be referred to as Jody and Rhonda rather than Mr. and Mrs. Beach. Other individuals will be referred to by their last name.
[4] Jody averred that Iron Horse's revenues went up 400% after he joined the business. The Court has no way of gauging the truth of the estimate.

Rhonda, who had substantial bookkeeping experience, to take a look at the books and see if anything was amiss. Rhonda soon discovered that Chase was embezzling from Iron Horse by forging checks, transferring money from Iron Horse's account to her account, and improperly crediting her debit card.[5] Iron Horse fired Chase and replaced her with Rhonda.[6]

Rhonda's duties included entering and reconciling the accounts receivable and accounts payable; billing; ordering parts; and assisting in the preparation of state and federal tax forms. Quarterly, Rhonda would email CPA Keith Balkcom copies of Iron Horse's bank statements, credit card statements, and gross receipts and payroll tax information. Balkcom would reconcile the books and prepare the state and federal quarterly tax returns for Grisham to sign.

In addition to her office manager duties, Rhonda did a lot of Grisham's personal business, e.g., scheduling doctor and other appointments, paying his personal credit card statements and other personal expenses, and even helping Grisham throw a graduation party for his son.

### Iron Horse Credit Cards

Iron Horse issued company credit cards to employees who traveled so they could pay for lodging, meals, and gas when out of town on company business. Iron Horse gave Jody a company credit card. Rhonda, who did not travel, was not issued a card. There was no written policy about credit card use.

---

[5] Iron Horse had been the victim of embezzlement once before. In about 2000-2002, Tammy Swager, Grisham's girlfriend and the mother of his son, was Iron Horse's office manager. She allegedly embezzled about $112,000 from Iron Horse. Grisham sued her in 2004 for embezzlement and fraud. She filed a chapter 7 bankruptcy case on the eve of trial, whereupon Grisham filed a nondischargeability action. He obtained a default judgment of nondischargeability. In October 2008 the state court entered a judgment against Swager for $214,207, with 15% post-judgment interest at 15%. Chase succeeded Swager as Iron Horse's office manager.

[6] Iron Horse sued Chase to recover the embezzled funds in December 2011. In August 2012 she stipulated to a judgment against her of about $147,000. Chase was indicted by a New Mexico grand jury on charges of embezzlement and credit card theft. She pled guilty and served one year in prison. Her probation ended in 2019.

When Rhonda started as Iron Horse's office manager, the credit card statements were mailed to Iron Horse monthly at a post office box in Peralta, New Mexico. In 2014, the issuer (Chase Bank) started emailing the monthly statements to rbeach@ironhorsewelding.net. Grisham knew about, and approved, the switch to emailed statements.

Before the switchover to email, Grisham would pick up the statements with Iron Horse's other mail and bring it to the office. Of the 517 credit card charges mentioned in Iron's Horse's complaint, 212 were charged in 2012 or 2013. Grisham had an opportunity to see these charges from the statements he picked up.

After switching to emailed credit card statements, Rhonda put each monthly statement in an electronic folder on her computer labeled "Chase Credit Card Statements." Grisham had access to the folder. Apparently he never reviewed any of the statements.

Credit card use was not strictly controlled or monitored. Jody testified credibly that he would give his card to employees if needed to buy parts or supplies and for construction projects at Iron Horse. "These cards were handed around to everybody," he said.

<u>The Relationship Between Grisham and the Beaches From 2010 to 2018</u>

Grisham and the Beaches all testified that before their falling out in 2019, they were good friends. Jody testified that Grisham was very gracious and supportive and had a very kind heart. He testified that "Allan did for me and I did for Allan." Jody would buy Grisham t-shirts when he was at motorcycle rallies. Rhonda testified that, after she started working as Iron Horse's office manager, she and Grisham had a "love/hate" relationship, that they "did a lot together, and discussed a lot together." She testified that Grisham would talk to her about his personal problems. She testified that it was a very close relationship, that "he treated me very well and I treated him very well." Once, after a disagreement at the office, Rhonda told Grisham that "she couldn't handle

-4-
Case 21-01028-t    Doc 73    Filed 10/21/22    Entered 10/21/22 14:54:33 Page 4 of 19

it no more" and left. Later that day Grisham showed up at the Beaches house with a 30-pack of Michelob Ultra Light beer and a house plant, hoping to smooth things over.

Grisham testified that he had a close personal relationship with the Beaches, and that "in the early years, things were good." Grisham went to the wedding of one of the Beaches' daughters. One year Grisham invited the Beaches to his parents' house on New Years' day. Grisham used to call Rhonda "my mijita" (my daughter).

Shortly after Rhonda started as Iron Horse's office manager, Grisham bought a new Toyota Tacoma for Rhonda to drive to and from work.

### Grisham Buys Jody a Motorcycle

In April 2013, Jody wanted to trade in his 2005 Harley Davidson Heritage Softail for a newer, bigger Harley.[7] He talked to Grisham about it. Grisham said that he would buy the motorcycle for Jody. He wrote out a check and paid for it. Jody maintains that it was a gift, but Grisham claims he only loaned the money to Jody. The transaction was never memorialized by a writing. At trial, Grisham further confused the issue by claiming that he got the money for the motorcycle from the Line of Credit (defined below).The Line of Credit was not created until 2014.

### Grisham Helps the Beaches Buy a House

When Iron Horse hired Jody, the Beaches were renting a house for about $2,500 a month. Grisham offered to help them buy a house, which he thought would not cost them any more than renting. Rhonda found a house on Chayote Road NE in Rio Rancho, New Mexico (the "Chayote house"). Grisham bought it for $430,000. He financed the purchase with a $344,000 first mortgage and a $43,000 second mortgage. Under an oral agreement, the Beaches moved into the house in

---

[7] The type of Harley Davidson was not specified in the trial testimony. The Beaches bankruptcy schedules include a 2013 Harley Davidson FLHXI, which might be the motorcycle Grisham paid for in 2013.

August 2014 and began making the monthly mortgage payments on the first and second mortgages. The house remained in Grisham's name.

The Beaches paid the first and second mortgages as agreed. They paid the first mortgage from their Iron Horse salaries. The second mortgage was paid through $2,100/month "commissions" earned by Jody, which Iron Horse started to pay after Grisham bought the house. None of the commissions were ever paid to the Beaches. Instead, Grisham used the money to pay the second mortgage directly.[8]

### The Line of Credit

In 2014 Grisham opened a line of credit in his name (the "Line of Credit") and drew on the line for the earnest money ($4,150) and down payment ($40,821.28) on the Chayote house. Both of these were paid by check to Stewart Title. Grisham also asserts he paid an additional $19,178.72 to the Beaches for improvements to the house. However, his only evidence is a check from Iron Horse to Grisham, dated two days before the closing on the house purchase. The Beaches dispute that the $19,178.72 was used to improve the house.

Grisham testified that the Beaches made regular payments on the Line of Credit. The Beaches deny this. They testified that they agreed to, and did, pay the first and second mortgages, but that there was no discussion about repaying the Line of Credit. Rhonda also testified that Grisham used some of the Line of Credit for personal expenses.

There is no writing of any kind memorializing any agreement with respect to the Line of Credit draws, including how much was loaned to the Beaches (if the money was not a gift), whether

---

[8] It does not appear that the commissions were treated as Jody's taxable income. For example, the Beaches declared $162,310 of adjusted gross income in 2017. That amount appears to include Jody's and Rhonda's respective salaries and bonuses, but not $25,200 in additional commissions.

it accrued interest, whether it was secured or unsecured, and/or what the repayment terms might be. Grisham produced no evidence that the Beaches ever paid on the Line of Credit.

### Grisham Fires the Beaches

In the spring of 2019, Jody learned that Grisham was considering using Iron Horse's profits to buy investment real estate rather putting the money back into the business. This upset Jody; he thought he was the primary reason Iron Horse was profitable, so he felt it was wrong of Grisham to siphon the money out of the business. Jody decided to retaliate against Grisham by quitting Iron Horse, encouraging other employees to quit, and taking other actions to harm or sabotage Iron Horse's business and prospects. Grisham got wind of Jody's actions and fired the Beaches in August 2019.

### Grisham Quitclaims the Chayote House to the Beaches

After the relationship began to sour but before Iron Horse fired the Beaches, Grisham quitclaimed the Chayote house to the Beaches. There is a disagreement about what was promised to Grisham in exchange for the deed. According to the Beaches, they promised to refinance the house and pay off the first and second mortgages. Grisham understood that the promise also included paying off the Line of Credit. The Beaches deny that was ever part of the deal. A written agreement would be extremely helpful in determining the intent of the parties. None exists.

### The Beaches' Use of the Iron Horse Credit Card

There is starkly conflicting testimony about whether Grisham authorized the Beaches to charge personal expenses on the Iron Horse credit card. According to Jody, Grisham gave him permission to use the credit card whenever he felt like it. Jody testified that Grisham said, "When have I ever told you no?" and "as long as you don't buy a Camaro." Jody testified that Grisham never told him no when he asked to use the card for a personal expense. Jody admitted that he did

-7-
Case 21-01028-t    Doc 73    Filed 10/21/22    Entered 10/21/22 14:54:33 Page 7 of 19

not ask every time, but that was because Grisham had told him to use the card as he wanted, saying "you are kind of like a partner, without any financial risk." Jody testified that Grisham said to him "Quit asking, you don't have to ask me every time."

Rhonda testified that she always told Grisham before charging any personal expenses to the Iron Horse credit card. She testified that she would ask Grisham for the card and he would hand her his wallet, saying "take whatever you need." She testified that she charged the Chayote house utilities and landscape maintenance to the card because Grisham treated the house as a rental property and wanted the deductions. She testified that none of the charges were on an automatic monthly deduction. Instead, she would charge the card every month and Grisham was aware of all of the charges.

Grisham flatly denies that Rhonda ever asked him for permission to charge personal expenses such as utilities, insurance, or the Verizon phone bill to the Iron Horse credit card. In response to the question: "Did Allan Grisham give permission to Rhonda Beach to make charges on the Chase card issued to you?" Grisham answered, "Absolutely not." In response to the question "Did Rhonda Beach ask you for permission to charge Verizon in December 2017?" Grisham testified "Absolutely not. I had no knowledge of it until we got our statements back from Chase, the same statements that were missing from our cabinet." Similarly, after listening to Jody's testimony about his use of the Iron Horse credit card, Grisham emphatically and repeatedly testified that what Jody said was "an absolute lie."

Thus, on the critical issue in this adversary proceeding, the sworn testimony of the three key witnesses cannot be reconciled. Someone is not telling the truth.

Credibility Problems

In general, Grisham is an honest, hard-working man, trying his best to run his business. He is not beyond reproach, however. Several examples stand out from the trial evidence.

The most egregious is the case of Benjamin Griego's faked salary reduction. Griego, an Iron Horse employee, went through a difficult divorce in 2018. He wanted to minimize the amount of support he had to pay his ex-wife. To assist him, Grisham directed Jody to fabricate a letter demoting Griego for poor work performance and cutting his salary by 50%. In fact, there was no dissatisfaction with Griego's work, no demotion, and no salary reduction. After the fake letter was prepared, Iron Horse started paying Griego half his regular salary through normal payroll channels, while paying the other half in cash, "under the table." The Beaches testified that they advised Grisham and Griego not to engage in this subterfuge. When asked at trial if he recognized the fake demotion letter, Grisham testified that he did not recall it. However, he testified that Jody probably wrote the letter because Jody did not like Griego. The Court finds that this explanation is not credible. Furthermore, it is inconsistent with Iron Horse's response to a discovery request, which stated: "Ben was not demoted. Ben requested to go part-time due [sic] the demand/stress of his active divorce case. After approximately 6 weeks, Ben returned himself to full time." This statement is not credible either.

Rhonda testified credibly that Grisham went to the bank and got the cash needed to pay Griego under the table. Grisham denied this, but the Court finds that it happened and that Grisham knew about and orchestrated Griego's fraudulent pay cut.[9]

---

[9] In a related matter, Griego did not want his divorce lawyer to think that he had any money, so he asked Grisham to write a $3,000 check to the divorce lawyer and make it appear to be a loan or gift from Iron Horse. Grisham did so. Griego then gave Iron Horse $3,000 in cash. Thus, the fraud extended to Griego's lawyer as well as his ex-wife.

A second example is that after he fired the Beaches, Grisham impersonated Jody in a call to Progressive Insurance about the insurance payments charged to the Iron Horse credit card.

Third, in October 2020 Grisham forged Rhonda's signature when he submitted a written request to the City of Rio Rancho for water bills on the Chayote house.

Fourth, although he argues that 517 charges on the Iron Horse credit card were unauthorized personal expenses, Grisham has never caused Iron Horse to issue 1099s to the Beaches.[10]

Finally, there is uncontradicted evidence that Grisham sometimes employed a Mr. Chee at Iron Horse, but made the paychecks payable to his wife so Chee's regular employer would not find out that he was moonlighting at Iron Horse.

This is not to say that the Beaches were unfailingly credible. At trial, Jody was boastful and prone to exaggeration. Both Beaches tended to testify on close questions in the way that benefitted them. Both Beaches "pled the Fifth" in a state court trial with Iron Horse, in response to questions about the challenged credit card charges.[11] Finally, the $350,000 state court judgment Iron Horse obtained against Jody for breach of duty and his efforts to destroy Iron Horse's business does not inspire confidence in Jody's rectitude.

The Altered Credit Card Statements

Grisham testified that after he fired Rhonda, he searched for Iron Horse's credit card statements. He testified that he found the October 2012 and December 2013 credit card statements in a box in Iron Horse's shop. Grisham testified that the statements had some of the charge entries pasted over with other entries. The pasted-over entries were for charges that benefitted the Beaches

---

[10] Of course, if the charges were authorized, Iron Horse's tax treatment of them may well have been improper, and sending 1099s would call attention to that fact.

[11] There was an ongoing criminal investigation into the Beaches' alleged embezzlement, prompted by Iron Horse, so "pleading the fifth" may well have been advisable.

personally (e.g., payments to Progressive Insurance, Verizon, PNM, and New Mexico Gas). They were covered by charges that benefitted Iron Horse (e.g., Remco Bolts, Lee's Electric Motors, and O'Reilly Auto Parts). However, other charges Grisham now claims were unauthorized were not covered up (e.g., a $253.45 payment to the City of Rio Rancho and a $149.05 payment to Healing Arts Chiropractic). Of the eight challenged charges on the December 2013 statement, four allegedly were covered by the "cut and paste" technique and four were not. Grisham turned both statements over to the Sheriff's office in August 2020, according to the Sheriff's investigation report. Iron Horse contends that Rhonda prepared the "cut and paste" statements to hide the Beaches' unauthorized use of the Iron Horse credit card.

There is no evidence about if or how the "cut and paste" statements were used (were they shown to Grisham? Sent to the accountant?). There is no explanation why only two statements were altered, why only some charges were covered, or why, if Rhonda had altered the statements, she kept in file storage instead of throwing them away.

Rhonda vehemently denied creating the "cut and paste" credit card statements. She testified:

> From day one this has been a personal vendetta with Grisham; he is bound and determined to destroy me and my husband; that is his goal, and he will not stop until he does. And that is my question; if I had access to do what I was doing, why would I only cover up a few and why would I leave it in a box. I think that all the records were kept for years and years past. I know where this comes from. It's a personal vendetta.

The Court finds that Iron Horse did not carry its burden of proving that Rhonda created the "cut and paste" statements. The Court finds that a person as savvy as Rhonda, intent on hiding unauthorized credit card charges, would not resort to such a clumsy method, and then preserve the altered statements at Iron Horse for years.

<u>Other Examples of Iron Horse Paying Personal Expenses of Employees and Others</u>

Iron Horse helped an employees named Rigoberto Garcia and Jason Platero buy trucks they wanted. An employee named Brian Wisecarver charged dog or cat food on the Iron Horse credit card. Iron Horse bought airplane tickets for employees when there was a death in the family. Iron Horse wrote checks to employee Victor Cano at the end of each month to help him pay for insurance for his family. Finally, Grisham helped a friend named Wade Florence buy a house, a wedding ring, and a truck.[12]

<u>Lack of Documentation</u>

Because the parties have given contradictory testimony about the authority to charge the Beaches' personal expenses on the Iron Horse credit card, the Court must weigh all of the evidence in the record and try to determine the truth of the matter. A significant problem in doing so is Grisham's failure to document important financial transactions.

For example, the 2013 motorcycle purchase was never documented. Now Grisham claims the money was loaned, not given. If so, Grisham should have had Jody sign a promissory note or IOU.

Another example is the Line of Credit draws that Grisham claims were loans. Nothing documents the agreement of the parties on this potential $71,000 debt. Because nothing was ever memorialized, the Court cannot tell how much was given/loaned to the Beaches, whether an interest rate was agreed upon, whether any repayment terms were negotiated, and whether any payments were made. If Grisham had not intended to give the money to the Beaches, his failure to document the loan is inexplicable and inexcusable.

Similarly, Iron Horse's alleged loan to Jason Platero was never documented.

---

[12] It is not clear whether Florence was an Iron Horse employee.

-12-
Case 21-01028-t    Doc 73    Filed 10/21/22    Entered 10/21/22 14:54:33 Page 12 of 19

In addition, the $2,100 monthly commissions paid to Jody after August 2014 were not properly documented. Were the commissions salary? Was proper tax withholding done? Did Iron Horse pay its share of the withholding taxes? Were the commissions reported on Jody's W-2? Was the money actually paid to the holder of the second mortgage? Was any of the money paid to reduce the Line of Credit? $2,100 a month for five years is a lot of money ($126,000), especially if no taxes are withheld. Iron Horse's failure to document and account for the commissions casts doubt on Grisham's claim that the Beaches paid on the Line of Credit until September 2019.

### Lack of Accounting Controls and Prudent Business Practices

In a profitable, established businesses like Iron Horse, which can afford to pay lawyers and accountants, disputes about 517 allegedly unauthorized credit card charges, made over eight years, should never arise. For a fraction of what Iron Horse has spent on attorney fees, it could have put in place first rate accounting controls, written employee policies that are enforced, and employee compensation rules that comply with federal and state tax laws. Despite his experience with embezzlers Swager and Chase, Grisham continued to run a recklessly loose ship. Combined with a puzzling aversion to documenting transactions and agreements, one result is muddled, "swearing contest" disputes like this one.

### Grisham Blows Hot or Cold

The Beaches both testified credibly that Grisham was a very generous friend and employer when the relationship was good. They also testified, however, again credibly, that if the relationship soured, Grisham turned on his former employee/friend and became vindictive. Thus, Iron Horse/Grisham sued Swager, Chase, Platero, Beach, and Rhonda, claiming that each one "stole" from Iron Horse. Certainly, there were good grounds to accuse Swager and Chase of stealing: both were caught red-handed. Leveling the same charge against Platero is a different

matter. He apparently left Iron Horse's employment with an unpaid debt (maybe) of about $2,737.35, loaned or given to help Platero buy a truck. Per Grisham's unvarying style, there is nothing in writing about the alleged loan. Nevertheless, at trial Grisham twice testified that Platero "stole" from Iron Horse. That is an inaccurate and unfair characterization of the dispute.

With respect to the Beaches, Grisham apparently had good reason to complain of Jody's tortious behavior in 2019. The resulting large judgment against Jody vindicates Grisham's view that Jody tried to do him wrong. What happened after the relationship became toxic, however, does not necessarily mean that the Beaches "stole" from Iron Horse during the years Grisham and the Beaches were good friends and colleagues.

Grisham has difficulty letting go of past wrongs, no matter how much it costs to hold on. Swager embezzled in 2000-2002 and Grisham is still trying to collect from her. Grisham told Rhonda he wanted to "destroy [Swager]" and was "going to outlive her and make her life miserable because of what she did to him." His attitude toward Chase is similar. A net recovery is less important to Grisham than making the wrongdoer miserable.

<u>Iron Horse Sued Jody Three Times Before Adding an Embezzlement Claim</u>

On August 19, 2019, Iron Horse sued Jody for damages related to his alleged efforts to destroy Iron Horse's business. No mention was made of any alleged embezzlement. The action resulted in a judgment against Beach for $325,000.

Iron Horse sued Jody again on September 11, 2019, to collect the Line of Credit debt. Again, embezzlement was not mentioned, although at trial, conducted in late 2020 and early 2021,[13] Jody was questioned about the allegedly unauthorized credit card charges.

---

[13] The Beaches filed this case before the state court ruled.

On October 1, 2019, Grisham filed a police report alleging that Jody embezzled from Iron Horse through unauthorized use of Iron Horse's credit card.[14]

Iron Horse's third lawsuit against Jody was an adversary proceeding filed in this bankruptcy case on August 4, 2021. It sought a declaration that Iron Horse's $350,000 judgment was nondischargeable. The adversary proceeding was dismissed by agreement of the parties because of § 1328(a). Embezzlement was not mentioned in the proceeding.

Finally, Iron Horse filed this proceeding on September 20, 2021, naming Rhonda as a defendant for the first time and also suing the Beaches for embezzlement for the first time. Why didn't Iron Horse, an aggressive, tenacious litigator, sue the Beaches for embezzlement in 2019?

<u>The Challenged Credit Card Charges</u>

Iron Horse filed this adversary proceeding on September 20, 2021, alleging that Defendants embezzled $136,342.67. Specifically, Iron Horse alleges that Defendants made 517 unauthorized personal purchases using Iron Horse's credit card, beginning November 27, 2012, and ending July 26, 2019. Most of the charges were made in 2013 and 2014.

Defendants moved for a partial summary judgment that most of the challenged charges were made more than four years before Iron Horse filed suit, and therefore were barred by the statute of limitations. The Court granted the motion, overruling Iron Horse's "discovery rule" defense. The charges that survived Defendants' summary judgment motion are:

| Date     | Payee   | Amount    |
|----------|---------|-----------|
| 12/27/17 | Verizon | $ 669.34  |
| 1/11/18  | Verizon | $ 477.53  |
| 1/25/18  | Verizon | $ 715.84  |
| 2/13/18  | Verizon | $ 621.05  |
| 3/29/18  | Verizon | $ 994.40  |
| 4/26/18  | Verizon | $ 561.61  |

---

[14] In the report, Grisham stated that "due to the volume of activity on these cards and Beach being a longtime trusted employee, he did not monitor his transaction out of this trust for him." He did not say anything about not having access to the statements.

| | | |
|---|---|---|
| 5/31/18 | Verizon | $ 994.23 |
| 7/3/18 | Verizon | $ 855.43 |
| 8/2/18 | Verizon | $ 959.24 |
| 8/24/18 | Verizon | $1,043.26 |
| 9/28/18 | Verizon | $ 825.74 |
| 10/27/18 | Verizon | $ 797.47 |
| 11/28/18 | Verizon | $ 560.26 |
| 12/22/18 | Verizon | $ 973.00 |
| 1/31/19 | Verizon | $1,802.82 |
| 3/23/19 | Verizon | $ 922.14 |
| 4/30/19 | Verizon | $ 782.75 |
| 5/24/19 | Verizon | $ 752.97 |
| 7/3/19 | Verizon | $ 762.36 |
| 7/26/19 | Verizon | $ 788.54 |
| Total: | | $16,859.98 |

The Beaches started paying their Verizon bill with the company credit card on October 22, 2013, and stopped on July 26, 2019, nearly six years later.

B.  §§ 523(a)(4) and 1328(a).

Section 523(a)(4) excepts from discharge "any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" A § 523(a)(4) nondischargeable debt is excepted from the chapter 13 discharge. Section 1328(a)(2); *see also Andrews v. Michigan Unemployment Ins. Agency,* 891 F.3d 245, 250 (6th Cir. 2018) (The 2005 amendments to the Code were intended to prevent discharge of debts based on embezzlement).

C.  Embezzlement Under § 523(a)(4).

> Embezzlement under § 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Hernandez v. Musgrave (In re Musgrave)*, No. AP. 09–01006, 2011 WL 312883, at *5 (10th Cir. BAP Feb. 2, 2011) (citing *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988)). "The elements required to prove embezzlement are: (1) entrustment, (2) of property (3) of another (4) that is misappropriated (used or consumed for a purpose other than for which it was entrusted), (5) with fraudulent intent." *Id.* (citing *Tulsa Spine Hosp., LLC v. Tucker (In re Tucker)*, 346 B.R. 844, 852 (Bankr. E.D. Okla. 2006)). The fraudulent intent required for embezzlement is the "intention to steal." *Chenaille v. Palilla (In re Palilla)*, 493 B.R. 248, 252 (Bankr. D. Colo. 2013). Embezzlement also "requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or

constructive fraud." *Hill v. Putvin (In re Putvin)*, 332 B.R. 619, 627 (10th Cir. BAP 2005) (citation omitted).

*In re Bringhurst*, 569 B.R. 814, 822 (Bankr. D. Utah 2017) (footnotes inserted into the text); *see also In re Kaplan*, 634 B.R. 673, 693 (Bankr. E.D. Pa. 2021) (listing the same five elements); *In re Biggs*, 563 B.R. 319, 325 (Bankr. D. Idaho 2017) ("Under § 523(a)(4), 'embezzlement' refers to 'the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come.'"); *In re Dorado*, 400 B.R. 304, 309 (Bankr. D.N.M. 2008) (plaintiff must prove that the defendant fraudulently deprived plaintiff of its property after lawfully acquiring it).

Fiduciary duty "is not a requisite to embezzlement or larceny within the meaning of 11 U.S.C. § 523(a)(4)." *In re Dorado*, 400 B.R. at 309.

In a nondischargeability action, the Plaintiff must prove the elements of its claim by a preponderance of the evidence. *In re Kaplan*, 634 B.R. at 685, citing *In re Bayer*, 521 B.R. 491, 499 (Bankr. E.D. Pa. 2014); *In re Berry*, 2012 WL 4739405, at *4 (Bankr. W.D. Pa.), citing *Grogan v. Garner*, 498 U.S. 279, 285 (1991).

Misuse of a company credit card to pay for personal expenses can be embezzlement. *See, e.g., In re McQuillin*, 509 B.R. 773, 786 (Bankr. D. Mass. 2014); *In re Patel*, 551 B.R. 488, 496 (Bankr. D.N.M. 2016) (citing *McQuillin* and discussing cases that equate unauthorized credit use with embezzlement).

D.  <u>Iron Horse Did Not Carry Its Burden of Proving that the Verizon Charges were Unauthorized</u>.

The only disputed fact relating to Iron Horse's embezzlement claim is whether the Verizon charges were authorized. If they were, then the charges could not have been "misappropriated with fraudulent intent."

Grisham makes a plausible argument that Beaches' Verizon phone bill charges were unauthorized. First, employees should not be using company credit cards to pay personal expenses. Second, the mobile phone bill include phones and/or service for the Beaches' children and Rhonda's parents. There is no business reason to pay these expenses. Finally, Grisham adamantly denies authorizing the charges or even knowing about them.

The Beaches have an equally plausible counterargument, however. They testified without contradiction that Grisham was looking for tax deductions. This is consistent with the evidence that Grisham is not a meticulous taxpayer.

The Beaches also argue that Grisham appreciated their positive contributions to Iron Horse's success and wanted to reward them financially. As it appears Grisham was not interested in making Jody a partner in the business,[15] the Court finds it plausible that Grisham agreed to pay certain of the Beaches' personal expenses instead. Such an agreement would be consistent with his other acts of generosity, such as buying a pickup truck for Rhonda to drive, buying Jody a motorcycle, and helping the Beaches buy their house. In addition, there is evidence that Grisham allowed other employees to pay personal expenses with Iron Horse's credit card, and that Grisham was quite generous in paying, through checks or other means, employees' personal expenses.

Furthermore, the Beaches have a plausible argument about the phone bill in particular, i.e., that by keeping their personal phones and service plan, they saved Iron Horse the expense of providing them with company phones and service plans.

Another important fact is that the challenged charges appeared every month on a credit card statement that Grisham could very easily have reviewed, and that his outside CPA must have

---

[15] Herein may lie the crux of the problem between Grisham and the Beaches. Jody was more valuable than a mere employee. In other circumstances he would have become Grisham's business partner and a co-owner of Iron Horse. Grisham, for what may have been good reasons, wanted to keep Iron Horse as a one member LLC. Given this tension, a split was bound to happen.

reviewed. Had the Beaches "intended to steal" from Iron Horse, they could not have picked a more easily detectable method.

In addition, both Beaches testified plausibly that Grisham was aware of, and consent to, the Verizon charges.

Finally, the Court finds that Grisham, in many ways a kind and admirable man, has a vengeful streak. He is not one to turn the other cheek. Instead, when Grisham believes a former employee/friend has done him wrong, he goes after him with a broken bottle. A witness bent on payback can find it difficult to be impartial about facts that might get in the way of vengeance.

Overall, the Court finds that the Beaches' version of events, about the Verizon charges in particular and the other charges in general, is slightly more credible than Grisham's. The Court therefore finds and concludes that Iron Horse did not carry its burden of proving that the Verizon phone bill payments were unauthorized. Iron Horse's embezzlement claim therefore fails for lack of proof that any funds were misappropriated with fraudulent intent.

## CONCLUSION

Iron Horse did not carry its burden of proving that the Beaches' use of the Iron Horse credit card to pay their Verizon phone bills from December 2017 until July 2019 was unauthorized. A final judgment in the Beaches favor will be entered separately.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 21, 2022
Copies to: counsel of record